# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### August 14, 2013 Session

## STATE OF TENNESSEE v. JEFFREY M. FORGUSON

**Appeal from the Circuit Court for Stewart County**
**No. 4-2101-CR-09    George C. Sexton, Judge**

_____

**No. M2013-00257-CCA-R3-CD - Filed February 18, 2014**

_____

A Stewart County jury convicted the Defendant, Jeffrey M. Forguson, of sale of a schedule IV drug (Alprazolam) and sale of a Schedule III drug (Dihydrocodeinone).  The trial court sentenced the Defendant to serve consecutive six-year sentences for an effective sentence of twelve years in the Tennessee Department of Correction.  On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his convictions; (2) consecutive sentencing was improper in his case; and (3) the trial court could not properly fulfill its role as thirteenth juror.  After a thorough review of the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JERRY L. SMITH, J., joined.  JAMES CURWOOD WITT, JR., J., filed a separate concurring opinion.

Michael J. Flanagan, Nashville, Tennessee, for the appellant, Jeffrey M. Forguson.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Dan M. Alsobrooks, District Attorney General; Sarah Wojnarowski, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from a drug buy conducted under police surveillance between the Defendant and a confidential informant.  For this drug buy, a Stewart County grand jury

indicted the Defendant for sale of a schedule IV drug (Alprazolam[1]) and sale of a Schedule III drug (Dihydrocodeinone[2]).

## A. Trial

At a trial on these charges, the State presented the following evidence: Danny Dunaway testified that in May 2009 he was paid to work with the 23rd Judicial Drug Task Force as a confidential informant. Dunaway testified about a drug purchase he made from the Defendant on May 20, 2009. Dunaway explained that he called the Defendant to inquire about a possible purchase of Vicodin. The Defendant confirmed that he had Vicodin and agreed to meet Dunaway at the West Side Market for the exchange, which was to include $150 for thirty Vicodin. Dunaway met with Agent James Crowe, a 23rd Judicial Drug Task Force agent, before meeting the Defendant, and Agent Crowe placed an audio recording device on Dunaway's person and a video recording device inside Dunaway's vehicle, a Chevrolet Suburban. Agent Crowe also searched Dunaway and his vehicle before the meeting with the Defendant.

Dunaway testified that he arrived at the West Side Market before the Defendant, and that, when the Defendant arrived, he got inside Dunaway's Suburban. The Defendant and Dunaway exchanged the pills for the money, and the Defendant went back to his vehicle to retrieve change for Dunaway. After giving the change to Dunaway, the Defendant told Dunaway that "he could get some more pills later on" and "he'd let [Dunaway] know when he had [the pills]." The Defendant then left in his vehicle.

The State played the video recording of the transaction for the jury. On the video recording, a Task Force agent is heard relaying information about the controlled buy. The agent states that he is giving Dunaway $160 for the purchase and Dunaway will return with $10. The video shows Dunaway arriving at the agreed upon location and waiting in his vehicle. The Defendant then arrives in a white truck and, after a greeting, Dunaway asks the Defendant if he has change. The video shows the Defendant returning to his truck and then walking back to Dunaway's vehicle. Dunaway can be heard telling the Defendant that he

---

[1] Alprazolam, more commonly known as Xanax, is a benzodiazepine commonly used to treat anxiety. Alprazolam is classified as a schedule IV controlled substance in Tennessee. *See* T.C.A. § 39-17-412(c)(1).

[2] Hydrocodone, or Dihydrocodeinone, is a powerful and addictive semi-synthetic opioid prescription pain killer derived from codeine. Depending on the precise dose or compound of Hydrocodone at issue, it is either a schedule II or schedule III controlled substance in Tennessee. *See* T.C.A. § 39-17-408(c)(7); T.C.A. § 39-17-410(e)(1)

gave him a dollar bill rather than a ten dollar bill. The Defendant then tells Dunaway that he will be getting more pills in eighteen days. The Defendant says that there is going to be "a bunch of them so you better have a lot of money." Dunaway then inquires whether the Defendant has some Xanax. The Defendant responds, stating, "I sold all of them but I'll get some more." The Defendant said he had "300 of them coming the same day." After more small talk, the Defendant asks Dunaway where he lives, "this side of the river or the other side of the river?" The two men then depart and Dunaway drives back to meet with police. A police officer asks Dunaway to tell him what happened, and Dunaway states that the Defendant called him and told him he had some pills. Dunaway states that after consideration of several locations, he and the Defendant decided upon West Side Market. Dunaway said he gave the Defendant $150 for thirty Vicodin. He gave both the remaining $10 from the $160 buy money and the thirty pills to the officer, who counted the thirty pills. Dunaway said that the Defendant told him he would have more "stuff" on the eighteenth and that the Defendant would "let [Dunaway] know."

Dunaway testified that the Defendant's wife and two children were in the Defendant's vehicle during the transaction. Dunaway expressed concern about the children observing the exchange. Dunaway explained that he and the Defendant were cousins but that the Defendant did not know where he was living. On the video recording of the transaction, the jury heard the Defendant ask Dunaway where he was living. Dunaway explained to the jury that, even though he and the Defendant were cousins, the Defendant did not visit him at his residence.

Dunaway testified that, after purchasing the Vicodin from the Defendant, he drove directly to meet Agent Crowe. He recounted the events that had occurred to Agent Crowe and turned over the remaining money and pills.

Dunaway testified that, approximately a week later, he arranged to buy 150 Xanax pills from the Defendant. Dunaway said that, before this transaction, police met with him and searched his person and vehicle. Police again placed recording devices on his person and inside his vehicle. On this occasion Dunaway met the Defendant at "the old Cajun place out just back this side of Paris Landing bridge." Dunaway said that during this meeting police were planning to make an arrest.

On the audio recording of this transaction, Dunaway can be heard talking with the Defendant about purchasing 150 pills for $125. Dunaway asks the Defendant if he has change for $130. Dunaway tells the Defendant he needs the five dollars change to buy gas for his drive home. The Defendant suggested they find a new meeting place next time, stating "if he gets caught" "they'll hang me." He tells Dunaway that it is a "federal offense" to sell the pills. The Defendant confirms that there are 150 pills after Dunaway tells him that

3

he is splitting the pills with another person. The Defendant tells Dunaway that if he purchases 250 pills from him, he will sell the pills for $200.00. Police officers initiating the arrest are then heard on the audio recording. Several minutes later, Dunaway, consistent with his trial testimony, can be heard on the audio recording recounting the details of the exchange to a police officer.

Dunaway testified that he never told the Defendant that he needed the pills because he had cancer.

On cross-examination, Dunaway agreed that he and the Defendant "grew up together." He denied having ever been diagnosed with cancer and confirmed that he had never told the Defendant that he had cancer. Dunaway stated that he was aware that the Defendant had received a settlement after having an accident involving a dump truck but was unaware of whether the Defendant's injuries necessitated prescription medication. Dunaway said that, during a telephone conversation, the Defendant told him that some of the pills were "coming from his wife." Dunaway denied approaching the Defendant at the Defendant's grandmother's funeral to request pills.

On redirect examination, Dunaway testified that he told the Defendant that he would be selling the pills.

The parties stipulated to the admission of two forensic chemistry reports indicating that thirty "white tablets" were tested and proved to be dihydrocodeinone, a Schedule III controlled substance; and 150 tablets were alprazolam, a Schedule IV controlled substance.

Agent James Crowe, a 23rd Judicial Drug Task Force agent, testified that he worked with Dunaway, a paid confidential informant, on two drug transactions involving the Defendant. Agent Crowe explained that Dunaway's person and vehicle were searched for drugs and weapons before the meeting with the Defendant. On the May 20, 2009, Agent Crowe provided Dunaway with $160 to purchase thirty Vicodin for $150. He said the purchase was to take place at the West Side Market. Agent Crowe recalled that the transaction was recorded and police followed Dunaway to and from the meeting place.

Agent Crowe testified as to the second transaction, on May 27, 2009, during which Dunaway purchased 150 Xanax for $125 from the Defendant. Agent Crowe explained that, before giving the buy money to Dunaway, the serial numbers on the cash were recorded. After the Defendant's arrest, cash matching the recorded buy money was recovered from the Defendant's person.

Agent Crowe testified that after the May 27, 2009, exchange, both Dunaway and the

Defendant were arrested and placed in separate police vehicles. Agent Crowe said that he recovered the purchased pills from Dunaway and additional Xanax pills in the Defendant's truck. The pills found in the Defendant's truck were in a bottle indicating the prescription for the pills was for Carrie Forguson, the Defendant's wife. The Defendant was transported to the Sheriff's department where he was read *Miranda* rights, and he provided a written statement. Agent Crowe read the statement as follows:

> My cousin called me and asked if I had some Xanax. He said he wanted some. I took him 150 of them. He gave me 125 dollars for them. My wife was with me but had been - - had been told by myself that I was going over to see him about money he owed me. She had no idea as to what I was doing or what I - - or that I even had the pills in the truck.

Agent Crowe testified that, during his interview with the Defendant, the Defendant admitted to selling pills on other occasions to other people.

Agent Crowe testified that he was in phone contact with Dunaway during the transactions and never heard Dunaway tell the Defendant that he was ill or needed the pills for pain relief.

The defense presented the following evidence: Amanda Ballard testified that she used to work for the Defendant "[p]ainting and redoing houses." Ballard said that her mother had also worked for the Defendant until he learned that her mother was working while under the influence of prescription pills and terminated her employment.

Ballard testified that she met Dunaway in November 2008 at the Defendant's brother's tattoo shop. She recalled overhearing a conversation between the Defendant and Dunaway in which Dunaway told the Defendant he had cancer and needed "something for the pain." According to Ballard, the Defendant told Dunaway that "he would not do that." Even though Dunaway persisted, the Defendant refused to give Dunaway "anything" for the pain. On cross examination, Ballard agreed that she had a previous conviction for theft.

Dorothy Evans, one of the Defendant's sisters, testified that their grandmother's funeral was on November 4, 2008. While at the funeral, Evans spoke with Dunaway who told her that he had "heart problems" and "might have prostate cancer." Evans said that he did not mention any treatment plans for these illnesses.

Evans testified that her brother had been in "some trouble" in the '80s and '90s but that he was a "better person" now. She explained that, approximately ten years before, the Defendant was involved in an accident with a garbage truck and his head was crushed. The

Defendant sustained "some" brain damage from the injuries, which resulted in memory loss. Evans said that, since the accident, the Defendant had been "very caring, loving, [and] tried to help everybody."

On cross-examination, Evans agreed that, despite his injuries, the Defendant drove a vehicle and was enrolled in school. Evans clarified that Dunaway told her that he did have prostate cancer and not that he might have had prostate cancer. Evans agreed that the Defendant had "numerous felony convictions." She said that she was unaware that the Defendant had told police that he had sold pills to individuals other than Dunaway.

Susan Brosch, another of the Defendant's sisters, testified that four or five months earlier Dunaway told her that he had been diagnosed with prostate cancer and was being treated in Nashville. She said that Dunaway did not mention cancer to her at her grandmother's funeral in 2008. Brosch said that the Defendant has changed "[d]ramatically" since his accident. She said that, as a result of the accident, the Defendant sustained brain damage that affected his memory. When asked if the Defendant would sell pills to Dunaway to make money, Brosch responded, "No, no, my brother doesn't do that to make money."

Jerry Garrett, Jr., the Defendant's brother, testified that, approximately two years ago, Dunaway disclosed that he had cancer and "heart problems." Garrett elaborated, saying that he had asked Dunaway "why he got so fat?" Dunaway responded, "I think I got prostate cancer." Garrett said that Dunaway believed that medication he was taking caused him to gain weight. Garrett testified that the Defendant has suffered "bad loss of memory" since the accident. He said he was surprised to learn that police had charged the Defendant with selling drugs to Dunaway and described the Defendant as "honest."

Ruby Horton testified that the Defendant had lived "up the road" from her for almost four years. During this time she had occasion to spend time with him and his family. She said that she would invite "him and the boys" for dinner, and she picked "the kids" up from school. She described the Defendant as a "fantastic father." Horton said that, recently, the Defendant had learned that one of his sons had "got hooking up with the wrong kids at school . . . and started doing drugs." She said that the Defendant "immediately" admitted his son into a rehabilitation program upon learning of his drug use.

Horton testified that she was surprised to learn the Defendant had been accused of selling pills to Dunaway because the Defendant was not "the type of person who would do that."

James Stockdale, Jr., a Big Sandy City police officer, testified that he coached a Little League team with the Defendant. Officer Stockdale recalled the Defendant's telling him that

he had a family member who needed medication, and the Defendant "loaned him a couple." Officer Stockdale knew Agent Crowe from basic training and spoke with him briefly about the case. Agent Crowe told Officer Stockdale that the Defendant had "helped [him] a lot down there as a citizen." Based on this conversation, Officer Stockdale believed that as long as the Defendant "cooperated," he would not be charged.

Officer Stockdale testified that he did not believe the Defendant would sell drugs, and if the Defendant was involved in a drug transaction, it would be because he was trying to "help somebody out." He described the Defendant as an "outgoing, family guy."

Dr. Elizabeth Paschall, a veterinarian, testified that the Defendant was one of her clients and a "casual friend." Dr. Paschall said that the Defendant's oldest son had volunteered at her office and the Defendant painted her "new facility." Dr. Paschall recalled that the Defendant had told her that he had been arrested for "giving his cousin pills." She said that she did not believe the Defendant would have done this had he not been told "the story about cancer, pain, suffering." Dr. Paschall said that the Defendant is "protective of his family."

On cross-examination, Dr. Paschall confirmed that the Defendant told her that he gave his cousin some medication for pain because his cousin had cancer and was in a lot of pain. She agreed that one of the pills the Defendant sold was a pain pill but the other was an anti-anxiety pill.

Alisha Ritter, a Murray State University professor, testified that, during the previous school year, the Defendant had been enrolled as a student in her general psychology class. The Defendant had a D in class and during her discussions with him about his grade, she learned that he had difficulty consolidating and retaining information due to brain injury.

The Defendant testified that he had a criminal history that included felony burglaries in the late '80s and early '90s. He said that in 2000 he worked at a waste management facility and was crushed in an accident at work. As a result, the Defendant suffered from "[m]assive head injuries, [and] face injuries." The Defendant said that he underwent eighteen surgeries due to the accident and two years of intense therapy. The Defendant said that he still takes approximately seven different medications and described his medical bills as "astronomical." The Defendant said that this experience caused him to "appreciate life more."

The Defendant testified that he and Dunaway grew up together. He recounted various family members who suffered from cancer and so found Dunaway's assertion that he had prostate cancer plausible. The Defendant said that Dunaway told him that Dunaway was

"scared" and "in a lot of pain." The Defendant explained that, because he had just finished EMT school, he knew Dunaway would be in a lot of pain. The Defendant said that Dunaway first approached him at their grandmother's funeral asking for pain medication. The Defendant declined, but Dunaway persisted. The Defendant recalled that Dunaway called him one time on the telephone, and was crying due to the pain. The Defendant said that if Dunaway had called and simply asked him to sell Dunaway pills, the Defendant would have said no because the Defendant said he "didn't need the money." The Defendant explained that, at the time, he had twenty or thirty thousand dollars in contracts for work. The Defendant stated, "I'd never give anybody pain pills or sell pain pills to anyone."

Defense Counsel asked the Defendant why money was exchanged between Dunaway and him, and the Defendant responded as follows:

Because [Dunaway]'s the one who said he gave me money. I didn't say anything. If you listen to the videos, which I - - we tried to pay close attention to the other day, you know, I never asked for money. [Dunaway]'s telling me, you got ten dollars. I'm giving [Dunaway] money. I'm the worse drug dealer on the planet.

The Defendant testified that Dunaway told him that Dunaway was "trying to get on TennCare," so the Defendant gave Dunaway some pills to cover a short time and then told Dunaway not to call him anymore. The Defendant explained that he gave Dunaway the Xanax because Dunaway was scared. He said that he referenced the cost for future pills to attempt to "scare [Dunaway] away." The Defendant said that if he quoted a price too high then Dunaway might leave him alone.

The Defendant testified that he had "no clue" what Dunaway was referencing in the audio recording when he said that he was splitting the pills with someone else. He denied any knowledge of Dunaway's intention to split the pills with another person. He said that if Dunaway had told him he intended to share the pills, he "wouldn't have been there."

The Defendant testified that when he learned that his fifteen-year-old son was "getting drugs from school" he "put him" in Vanderbilt Hospital and Youth Town. The Defendant said that, initially, he tried to work with Agent Crowe doing controlled buys, but after receiving threats in his community, he stopped "helping them." It was shortly thereafter, the Defendant said, that he was charged with these crimes.

The Defendant agreed that he exchanged his prescription medication with his cousin and received money for it. He said that he did so because he "thought [his] cousin was sick."

On cross-examination, the Defendant explained that he had taken all the course work to be an EMT but had not registered yet with the State for certification. The Defendant denied any knowledge that Dunaway had heart problems but maintained that Dunaway had told him he had cancer.

The Defendant maintained that he never asked Dunaway for money and that it was Dunaway who raised the issue of money in exchange for the pills. When asked about his statements on the audio recording about selling Dunaway 150 pills for $125 or 250 pills for $200, the Defendant said that was two cousins "just bull crapping." He said that "if you listen to the CD again I'm laughing." The Defendant said he was telling Dunaway what "he wanted to hear to get away from the situation."

The Defendant testified that he had another charge for selling Xanax to Dunaway in Houston County. The State then played a portion of the recording of the Houston County transaction. On the recording, the Defendant can be heard telling Dunaway to call him on the 8th and asking, "how many you going to want?" The Defendant agreed that he invited Dunaway to call him on this occasion. The Defendant agreed that, based on all three transactions, he sold at least two hundred pills to Dunaway in one month's time.

The Defendant maintained that he did not hear Dunaway say that he was splitting the pills during their interaction. He also denied telling Agent Crowe that he had sold to two people other than Dunaway. He said that he told Agent Crowe that he "could get buys for him" in order to keep his wife "out of there."

Upon questioning by the trial court, the Defendant testified that the pills he sold to Dunaway were his prescription pills that are paid for through his wife's insurance. Upon further questioning by the State, the Defendant said he was currently on his wife's insurance plan and could not remember if at the time of these crimes he received prescription medication through TennCare.

The State re-called Agent James Crowe as a rebuttal witness. Agent Crowe testified that he conducted a drug buy from the Defendant in Houston County around the same time as the two controlled buys at issue in this case. Agent Crowe said that the informant purchased 80 Xanax for $80 from the Defendant. Agent Crowe confirmed that the same procedure was used in preparing the informant for the controlled buy as was used in the two controlled buys at issue in this case. The audio recording of the Houston County controlled buy was played for the jury.

The parties submitted by stipulation canceled checks the Defendant received for work done during the time frame of the drug buys.

After hearing the evidence, the jury convicted the Defendant of sale of a schedule IV controlled substance and sale of a Schedule III controlled substance. The trial court approved the jury's verdict as thirteenth juror.

## B. Sentencing Hearing

At the sentencing hearing, the parties presented the following evidence: Connie Turner testified that she prepared the presentence report. Turner recited the Defendant's criminal history contained in the presentence report as follows:

> [I]n September of '01 he had . . . a misdemeanor conviction for domestic violence; July of '90 he has six years for burglary, first degree; in October of '87 he had two years from Chicago for felony escape; in August of 1985 he was sentenced to - - '86 he was sentenced to seven years in Chicago for burglary; and then in March of '85 he was sentenced to six months in Chicago for theft of services.

The trial court then entered into evidence certified copies for the following convictions:

1. Domestic Battery (Indiana case number: 02D04-0109-CM-007292) - conviction date November 20, 2001

2. Theft of Labor or Services (Illinois case number: 84601005501) - conviction date March 27, 1985

3. Residential Burglary (Illinois case number: 85C60044301 ) - conviction date April 4, 1986

4. Burglary (Illinois case number: 90C66091601) - conviction date August 23, 1990
5. Residential Burglary (Illinois case number: 85C60044601) - conviction date April 4, 1986

6. Escape (Illinois case number: 87CR1375301) - conviction date December 14, 1987
7. Residential Burglary (Illinois case number: 85C60044501) - conviction date April 4, 1986

8. Residential Burglary (Illinois case number: 85C60044401) - conviction date March 4, 1986

10

The Defendant submitted two FEMA certificates of completion, documentation of training received since his trial and a letter from his cardiac physician.

The trial court then stated that it had considered the evidence presented at trial and the sentencing hearing, the presentence report, the principles of sentencing, arguments of counsel, the nature and characteristics of the criminal conduct, mitigating and enhancement factors, and the Defendant's potential for rehabilitation. In so doing, it found the Defendant a Range II multiple offender and found one applicable enhancement factor and one applicable mitigating factor. The trial court then sentenced the Defendant to serve six years for each conviction. The trial court next considered consecutive sentencing and, after concluding that the Defendant's criminal activity was extensive, ordered consecutive sentencing, for an effective sentence of twelve years. It is from this judgment that the Defendant appeals.

## II. Analysis

The Defendant contends that: (1) the evidence supporting his convictions is insufficient; (2) the trial court improperly applied consecutive sentencing; and (3) the trial court could not properly fulfill its role as thirteenth juror. The State responds that the evidence supports the jury's finding of the Defendant's guilt, the trial court properly imposed consecutive sentencing, and the trial court properly acted as the thirteenth juror.

## A. Sufficiency of the Evidence

The Defendant argues that the evidence in this case was insufficient to support a jury's finding that he was guilty beyond a reasonable doubt of sale of a schedule III controlled substance and sale of a schedule IV controlled substance. The Defendant asserts that the proof showed that Dunaway, the Defendant's cousin, "seeking monetary compensation, set upon a scheme to entice the Defendant to sell him prescription pills." The State responds that the evidence supports a finding that the Defendant sold drugs for profit and was not entrapped to commit these crimes. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App.

1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in *State v. Barone*, 852 S.W.2d 216, 218 (Tenn.1993) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

12

In this case, the Defendant was convicted of the sale of a Schedule III controlled substance and sale of a Schedule IV controlled substance pursuant to Tennessee Code Annotated section 39-17-417 (2012). That statute provides, in relevant part, that it is an offense for a defendant to "knowingly . . . sell a controlled substance." *See* T.C.A. § 39-17-417(a)(3). "[A] person . . . acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." T.C.A. § 39-11-302(b). The Defendant does not challenge the evidence that he sold pills to his cousin, Dunaway, on two occasions. Instead, he asserts that Dunaway told him he had cancer and was in a great deal of pain, repeatedly pleading with the Defendant to give him some of the Defendant's pain medication. The Defendant offered several character witnesses who testified that Dunaway had stated that he had cancer and that the Defendant is not the type of person who would sell drugs.

The evidence, viewed in the light most favorable to the State, shows that the Defendant and Dunaway met on at least two occasions, and the Defendant gave Dunaway prescription pills in exchange for money. The Defendant acknowledged the consequences of his conduct, telling Dunaway that selling the pills was a "federal offense." In the recorded conversations of the controlled buy, the Defendant speaks of future exchanges and offers a discount if Dunaway will purchase a larger number of pills. The Defendant tells Dunaway that he recently sold all of his Xanax but that he had "three hundred more coming the same day." During these conversations, there was no mention of medical issues, an illness, pain, or anxiety. Dunaway testified that he did not have cancer and never told the Defendant he had cancer. Further, after his arrest, the Defendant admitted to the police selling drugs to at least two other individuals. This evidence is sufficient for a jury to find beyond a reasonable doubt that the Defendant willingly and knowingly sold controlled substances to Dunaway.

The Defendant asserts that Dunaway, due to his familial relationship to the Defendant and his payment for services as a confidential informant, is not credible. As we earlier stated, "[q]uestions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *Bland*, 958 S.W.2d at 659. The jury heard both Dunaway's version of the events and the Defendant's explanations as to why he provided Dunaway with prescription pills for payment. The jury, by its verdict, found Dunaway's account of the exchange more credible than the Defendant's account.

Accordingly, we conclude that the State presented sufficient evidence from which a jury could find the Defendant guilty beyond a reasonable doubt of both counts of knowingly selling controlled substances. Therefore, the Defendant is not entitled to relief as to this issue.

13

## B. Consecutive Sentencing

The Defendant challenges the trial court's imposition of consecutive sentencing in this case. He asserts that the trial court improperly relied upon his history of prior convictions, which consists largely of convictions that are twenty or more years old. The State responds that the trial court carefully considered the facts and circumstances of this case and properly sentenced the Defendant. Again, we agree with the State.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2), (d) (2010); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008).

In *State v. Bise*, the Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" 380 S.W.3d 682, 708 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise,* 380 S.W.3d at 709-10. In other words, so long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707.

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order sentences to run consecutively if it finds any one of the statutory criteria by a preponderance of the evidence. As is relevant in this case, the trial court found the following criteria applicable:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

. . .

14

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

. . .

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(1), (3), and (7). These criteria are stated in the alternative; therefore, only one need exist to support the imposition of consecutive sentencing. *See id.*; *State v. Denise Dianne Brannigan*, No. E2011-00098-CCA-R3-CD, 2012 WL 2131111, at *19 (Tenn. Crim. App., at Knoxville, June 13, 2012), *no Tenn. R. App. P. 11 application filed*. The imposition of consecutive sentencing, however, is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed [.]" T.C.A. § 40-35-103(2), (4). We review a trial court's decision to impose consecutive sentences for an abuse of discretion with a presumption of reasonableness. *State v. James Allen Pollard*, – S.W.3rd --, NO. M2011-0032-SC-R11-CD (Tenn. Dec. 20, 2013).

In the present case, the trial court found that the Defendant's record of criminal activity is extensive. The State offered certified copies of convictions for two misdemeanor convictions and six felony convictions. In addition, the Defendant reported heroin and cocaine use from the time he was twelve years old until he was twenty-three. The Defendant also admitted to the police that he had sold pills to two individuals other than Dunaway. The Defendant argues that his convictions should not be considered because some of the convictions are more than twenty years old. The Defendant, however, offers no support for his contention that convictions of a certain age may not be considered in consecutive sentencing. The record supports the trial court's finding that the Defendant's criminal history is extensive, therefore, the trial court did not abuse its discretion when it ordered consecutive sentencing in this case. The Defendant is not entitled to relief.

**C. Thirteenth Juror**

The Defendant asserts that he is entitled to a new trial based upon the trial court judge's status as "Facebook friend" with the State's witness, Dunaway, and that their digital connection creates the appearance of impropriety. The State responds that, in consideration of the totality of the circumstances and the context in which the trial court knew Dunaway,

the trial court could still properly fulfill its duty as thirteenth juror.

"The right to a fair trial before an impartial tribunal is a fundamental constitutional right." *State v. Austin*, 87 S.W.3d 447 at 470 (Tenn. 2002). "[T]he preservation of the public's confidence in judicial neutrality requires not only that the judge be impartial in fact, but also that the judge be perceived to be impartial." *Kinard v. Kinard*, 986 S.W.2d 220, 228 (Tenn. Ct. App. 1998). Recusal is warranted "when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." *Alley v. State*, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994). "Hence, the test is ultimately an objective one since the appearance of bias is as injurious to the integrity of the judicial system as actual bias." *Davis v. Liberty Mut. Ins. Co.*, 38 S.W.3d 560, 565 (Tenn. 2001). "Whether recusal is necessary . . . rests within the discretion of the trial court." *State v. McCary*, 119 S.W.3d 226, 260 (Tenn. Crim. App. 2003) (citing *Caruthers v. State*, 814 S.W.2d 64, 67 (Tenn. Crim. App. 1991)). This Court will not interfere with the trial court's discretion unless clear abuse appears on the face of the record. *Caruthers*, 814 S.W.2d at 67.

We are limited in our review of this issue, as the record contains only the Defendant's assertion of impropriety and the trial court's response. At the motion for new trial, the Defendant's attorney stated:

> It's our position the trial court could not perform its function as an impartial 13th juror in a situation where the court determines whether there is sufficient evidence that trial counsel did not really make that motion for judgment of acquittal.
>
> The [D]efendant discovered and furnished me information that the trial court is on a social media web site known as "[Facebook]," and a friend of the trial court on the "[Facebook]" account is the confidential informant who testified at the trial. The confidential informant also has a "[Facebook]" page and the trial court is listed as a friend on the confidential informant's "[Facebook]" page. So it's our position that at a minimum it just has the appearance of an impropriety to the extent that the court could not function as a 13th juror.

The trial court responded to this issue, stating:

> Stewart County is a small county. The CI in [the Defendant's] case, ever since he was born, has lived within a mile of me. At this particular time he lives within a half a mile. I've known him all his life. If I recused myself on every

16

case that I either knew a witness or was friends with a witness, I couldn't try cases in Stewart County.

The fact that I knew the CI had no bearing on [the Defendant's] case. It would not have had any bearing on [the Defendant's] case. The CI, as I said, I've known him all his life. I've had him in court as a defendant when I was a prosecutor. I've had him in court in front of me as a judge on child support matters. So, if anything, I would've been more than likely to not believe the CI than to believe him.

The Defendant asserts that because the trial judge is Facebook "friends" with Dunaway, the appearance of bias is present. In this instance, the Defendant has simply not established that the trial judge's participation in the social network Facebook prevented him from properly exercising his role as thirteenth juror. The record in this case is not developed as to the length of the Facebook relationship between the trial court and the confidential informant, the extent of their internet interaction or the nature of the interactions. The fact that the trial judge was "friends" on Facebook with a witness is not sufficient proof that the trial court could not impartially fulfill its duty as thirteenth juror. In our review of the record, we find nothing to suggest that the trial court did not adequately function in its role as thirteenth juror and nothing to indicate bias on the part of the trial court.

### III. Conclusion

Based on the aforementioned reasoning and authorities we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE